IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GABRIELLE T. FREELS, )
)
Plaintiff, )
)
v. ) Civ. No. 09-947-SLR
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

Stephen A. Hampton of the Grady & Hampton Law Firm, Dover, Delaware.
Attorney for Plaintiff.

Patricia Anne Stewart of the Social Security Administration, Philadelphia, Pennsylvania.
Attorney for Defendant.

**MEMORANDUM OPINION**

Dated: March 25, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Gabrielle T. Freels ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff filed a motion for summary judgment asking the court to reverse the adminstrative decision and remand the case to the Commissioner with instructions to award benefits or, alternatively, for further proceedings. (D.I. 14) Defendant responded with a cross-motion for summary judgment requesting the court to affirm his decision and enter judgment in his favor. (D.I. 16) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB on May 1, 2007, alleging disability since September 16, 2006, due to psoriatic arthritis, psoriasis, toxic encephalopathy, auto-immune deficiency HLAD27 positive, and "leg pain." (D.I. 12 at 38, 39, 98, 127, 146, 160) Plaintiff was 29 years old on the onset date of her alleged disability. (*Id.* at 98). Defendant denied plaintiff's application on October 19, 2007, and upon reconsideration on May 8, 2008. (*Id.* at 49-51) Plaintiff requested a hearing which was held before an administrative law judge ("ALJ") on October 23, 2008. (*Id.* at 24, 66, 74) At the hearing, plaintiff, with the assistance of counsel, testified as to her condition. (*Id.* at 26) In addition, Diana Sims, an impartial Vocational Expert ("VE"), was present at the hearing and also testified. (*Id.* at 26, 41)

On November 19, 2008, the ALJ decided that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the nonexertional limitation of decreased exposure to molds and that plaintiff is capable of performing past relevant work as a bank teller. (*Id.* at 17-23) The ALJ's decision became final on October 31, 2009, after the Appeals Council denied plaintiff's request to review the hearing decision. (*Id.* at 1) On December 9, 2009, plaintiff brought the current action for review of the final decision denying her DIB. (D.I. 2)

### B. Non-Medical History

Plaintiff is currently 34 years old. She graduated from college in 1998, and received a cosmetology license in 2001. (D.I. 12 at 34, 132) Plaintiff's work experience, dating back to 1993, reached the level of substantial gainful activity and her employment constitutes past relevant work. (*Id.* at 12, 41, 42, 107, 128) Plaintiff stopped working on September 16, 2006,[1] the onset date of her alleged disability. (*Id.* at 127)

### C. Medical History

Plaintiff was under the care of a number of physicians. Contacts with her doctors, discussed below, are addressed in chronological order.

---

[1]The weekend of July 4, 2005, plaintiff moved to a ground floor condominium and within a few days her psoriasis flared, her pain increased, she felt fatigued, and she had daily headaches, nausea, deficits in cognitive functioning and nosebleeds at night. (D.I. 12 at 537) Plaintiff moved into her parents' house in October 2005, while mold was removed from the condominium. (*Id.* at 35) She returned to her home in January 2006. (*Id.*) Subsequently, in July 2006, she permanently moved into her parents' home because the mold returned exacerbating her illnesses. (*Id.*)

On October 15, 1999, plaintiff consulted with Jill Ratain, M.D. for psoriasis, tightness in her chest with related soreness in the right shoulder blade area, and difficulty with breathing. (*Id.* at 218) Her symptoms were intermittent, and abated with medication and heat. (*Id.*) She was exercising (water aerobics, using a treadmill and lifting light weights) and eating a vegetarian diet. (*Id.*) Dr. Ratain noted that plaintiff's psoriatic arthritis was stable and her musculoskeletal pain and spasm and associated shortness of breath were related to muscle spasm, with no evidence of significant pulmonary disease. (*Id.* at 219)

On December 9, 1999, plaintiff returned to Dr. Ratain with no complaints of musculoskeletal chest pain, shortness of breath or evidence of lung pathology. (*Id.* at 216-17) She did, however, have a mild rash on her back and a psoriasis flare-up on her scalp and nails. (*Id.*) A dermatological followup for the psoriasis was recommended. (*Id.*) Plaintiff was cautioned about attending cosmetology school due to potential joint and psoriasis flare-ups. (*Id.*)

When plaintiff returned to Dr. Ratain on March 28, 2000, she complained of psoriasis flare-ups and lesions on her scalp, pain and stiffness in her sacrum, and interim headaches. The dorsal redness and swelling of her hands had improved. (*Id.* at 214-15) Plaintiff reported that she had started cosmetology school, was stretching twice daily, and had no shortness of breath or chest pain. (*Id.*) Her diagnosis was fibromyalgia and psoriasis of her scalp and nail beds. (*Id.*)

On August 7, 2000, plaintiff followed up with Dr. Ratain for her psoriatic arthritis. (*Id.* at 212) She reported persistent pain around her coccyx associated with prolonged

sitting that was eased by using a pillow or standing, psoriasis lesions on her scalp, a morning syncopal[2] episode, intermittent swelling and pain on the dorsum of her left foot, and shortness of breath. (*Id.*) Plaintiff advised that she underwent an injection of the right sacroiliac joint at Hopkins Pain Center, which did not improve her symptoms. (*Id.*) Dr. Ratain assessed plaintiff's condition as clinically stable psoriatic arthritis, scalp psoriasis, coccydynia,[3] pain over her left foot related to a flat arch, and that the syncopal episode probably related to an increase of Imipramine (medication). (*Id.*)

On November 6, 2000, she returned to Dr. Ratain with increased pain in her hands, feet, hips and low back, increased stiffness, continuing pain in her coccyx and right low back, psoriasis flare-up of her scalp with new lesions on her skin, and feeling more fatigued. (*Id.* at 210) Plaintiff reported no new syncopal episodes and advised of her planned cosmetic abdominal surgery on December 19, 2000. (*Id.*) A dermatological followup was recommended for the psoriasis. (*Id.*)

On January 16, 2001, plaintiff had an office visit with Dr. Ratain for post abdominal plastic surgery with cellulitis at the incision site, fatigue, morning sickness, and joint pain. (*Id.* at 208) She was diagnosed with active psoriasis on her scalp, clinically stable psoriatic arthritis, and tenderness of her coccyx. (*Id.*) She was referred to Dr. Mark Grieb at Hopkins for possible injection to the coccyx and for a dermatological followup in February. (*Id.*)

---

[2] Syncopal is defined as a brief loss of consciousness; fainting. *http://www.medterms.com/script/main/art.asp?articlekey=5612*

[3] Coccydynia is defined as pain in the coccyx and adjacent regions. *http://www.medicinenet.com/coccydynia/article.htm*

4

Plaintiff returned to Dr. Ratain on April 24, 2001. (Id. at 206) That examination revealed fewer psoriatic lesions, mild improvement of the scalp and clinical improvement of the psoriatic arthritis. (Id.) She, however, was experiencing pain and swelling over the right thumb at the metaphalangeal joint and some swelling at the right second metacarpal phalangeal joint (index finger), and ongoing muscle discomfort over the right lateral trochanter.[4] (Id.) There was no evidence of trochanteric bursitis.[5] (Id.) Plaintiff reported that she still smoked. (Id.)

During an office visit on August 12, 2002 with Dr. Ratain, plaintiff reported feeling well over the past year, rating her pain at 1/10,[6] with no swelling of the fingers or toes, no pain in her ankles, no swelling or tenderness in her hands, no severe pain in her right hip, no shortness of breath, and control of the psoriasis. (Id. at 204) She did complain of occasional pain with redness and warmth over the dorsum of the right foot, morning stiffness, and achiness if she remained immobile for a period of time. (Id.) Plaintiff reported that she swam two times a week and exercised four to five times a week. (Id.) Her condition was assessed as: stable psoriatic arthritis, flat feet which

---

[4] The trochanter is either of the two knobs located at the head of the femur, the greater on the outside and the lesser on the inside, and serves to attach the muscles between the thigh and pelvis.
http://www.medterms.com/script/main/art.asp?articlekey=10448

[5] Bursitis is inflammation of the bursa which is a closed sac or envelope lined with synovial membrane and containing synovial fluid, usually found or formed in areas subject to friction (over an exposed or prominent body part or where a tendon passes over a bone). Synovia fluid is a fluid, the main function of which is to serve as a lubricant. http://www.medicinenet.com/bursitis/article.htm; http://www.medterms.com/script/main/art.asp?articlekey=5686

[6] Pain is rated on a scale from 1 to 10. A rating of 1 indicates minimal pain.

predisposed her to tendinitis, and minimal bilateral chondromalacia[7] of the knees, with no evidence of osteoarthritis. (Id.)

She returned to Dr. Ratain on December 1, 2003. (Id. at 202) At that time, plaintiff rated her pain level as 1/10, but complained of intermittent right heel/right ankle pain, increased psoriasis lesions on her back, and a rash on the soles of her feet. (Id.) Plaintiff reported using a tanning salon to control the psoriasis. She had not experienced any sever arthritic flare-ups. She was non-compliant with taking folic acid and completing blood work. (Id.) Dr. Ratain diagnosed a possible right heel spur. (Id.)

On March 1, 2004, plaintiff presented to Dr. Ratain with a pain rating of 1/10 and complaints of dry mouth and skin and a urinary tract infection since her previous visit. (Id. at 200) Her right foot and heel were pain-free. She had continued weekly tanning to control the psoriasis, and returned to exercising. (Id.) Dr. Ratain noted that the psoriatic arthritis was well-controlled. (Id.)

During the office visit with Dr. Ratain on September 23, 2004, plaintiff reported her pain level increased to 8/10, with pain in the right sacroiliac joint and lateral buttock, radiating laterally and diffusely down the right leg to the ankle/heel. (Id. at 198) Her psoriasis was controlled except for lesions on her feet. (Id.) She also had a toenail infection as a result of a pedicure. (Id.) Plaintiff reported that initially, the pain improved with exercise, but now was lingering throughout the day despite using an exercise bike for 30 minutes three to four times a week. (Id.) Improvement occurred

---

[7] Chondromalacia is degradation of the cartilage in the knee, usually caused by excessive wear between the patella and the bottom of the femur. http://www.medicinenet.com/patellofemoral_syndrome/article.htm

with stretching and heat, however, she began feeling worse the day before. (Id.) She also noted recent swelling over her right thumb, and significant premenstrual headaches with cervical discomfort and blurred vision. (Id.) Dr. Ratain assessed plaintiff with clinically improved psoriasis, no significant synovitis, except around the ankles, and possible mild DeQuervain tendinitis of the right hand. (Id. at 199)

When plaintiff returned to Dr. Ratain on February 7, 2005, her pain had decreased to 1/10, and the right hip and buttock pain with shooting pain radiating from the right sacroiliac joint down the right leg continued, but improved with heat. (Id. at 196) Plaintiff reported problems with weight bearing when the pain was severe. (Id.) She complained of psoriasis flares, with significant flaring on her arms and a rash on her hands that erupted from a viral infection. (Id.) Despite experiencing significant stress, plaintiff denied any oral ulcers, GI (gastrointestinal) upset, hair loss or shortness of breath. Dr. Ratain noted improvement in the significant psoriasis lesions on the soles of her feet; her energy as stable; and good relief from joint flares with Celebrex taken as needed. (Id.)

During an office visit with Dr. Ratain on May 9, 2005, plaintiff rated her pain as 1/10, and reported generally doing well with improvement in her psoriasis and only minimal stiffness in the mornings. (Id. at 194) She again denied any recent oral ulcers, rashes, GI upset, hair loss or shortness of breath. (Id.) Plaintiff had returned to exercising, was seeing a dietician, and taking diet pills. (Id.) Dr. Ratain's assessment was clinically stable psoriatic arthritis and a possible viral illness. (Id.)

Plaintiff initially saw Ritchie C. Shoemaker, M.D. on November 17, 2005, and

7

continued regular treatment with him until November 6, 2007. (*Id.* at 536) His history reported that, although plaintiff had a number of pre-existing conditions, she was essentially well until she moved into the condominium in July 2005, when she developed a rapid onset of increased health symptoms: flaring of the psoriasis, increased pain, fatigue, nosebleeds at night, daily headaches, nausea "and a new onset of severe deficits in executive cognitive functioning." (*Id.* at 536-37) By mid-August 2005, she had developed the additional symptoms of blurred vision and itchy eyes, accompanied by a dramatic flare in the psoriasis. (*Id.* at 537) His history further noted that only minimal improvement in her symptoms occurred after plaintiff moved. (*Id.*) Dr. Shoemaker also reported that environmental microbiological testing of her condominium confirmed mold growth. (*Id.* at 327-32, 538)

On November 17, 2005, Dr. Shoemaker conducted a spirometry exam[8] of plaintiff. (*Id.* at 340) The results were normal with plaintiff's calculated lung age at less than 20 years old. At the time of this test, plaintiff was 29 years old. (*Id.* at 340-41)

On June 12, 2006, Dr. Shoemaker diagnosed plaintiff with a biotoxin-associated illness due to the exposure to the interior environment of her home. (*Id.* at 284) This diagnosis was made after a trial exposure to the offending biotoxins, which confirmed that mold was the cause of her chronic inflammatory conditions. (*Id.* at 537) Subsequently, she was given an experimental protocol of low dose erythropoietin (epo) which resulted in a marked reduction of and correction of her abnormal C4a. (*Id.* at

---

[8] A spirometry exam determines the capacity of the lungs.
*http://www.medterms.com/script/main/art.asp?articlekey=39635*

8

554) Following the epo trial, plaintiff's MRS[9] showed excellent improvement. (*Id.* at 555)

On July 14, 2006, plaintiff underwent an MRI of her brain. (*Id.* at 190-192) The results indicated a 4mm x 2mm linear focus of increased T2 signal within the left midbrain which may represent an area of gliosis or demyelination. (*Id.*) No other focal brain lesions were noted. (*Id.*)

On July 24, 2006, plaintiff began treatment with Louis J. Ruland, III, M.D. for complaints of right knee pain and swelling. (*Id.* at 185) His examination revealed mild pain of the medial facet of the patella and moderate medial joint pain. (*Id.* at 186) His diagnosis was right knee patella femoral stress syndrome without signs of synovitis. (*Id.*) X-Rays of plaintiff's right knee showed minimal localized soft tissue swelling with no obvious abnormalities. (*Id.*) Benign exostosis of the proximal fibula and good preservation of the medial and lateral compartment and the patella femoral joint were noted. (*Id.*) Dr. Ruland administered an injection of xylocaine and cortisone for the pain and swelling. (*Id.*)

On September 11, 2006, plaintiff returned to Dr. Ruland for followup and reported the same symptoms as before. (*Id.* at 184) Examination of her right knee exhibited mild pain over the medial and lateral facets of the patella, mild pain with patellar compression, pain along the pes anserinus tendon and bursa, and mild pain with resisted flexion. (*Id.*) She had no pain with resisted extension or on rotation of hips and had normal sensation in her leg. (*Id.*) Dr. Ruland diagnosed right knee patella

---

[9] MRS is an abbreviation for magnetic resonance spectroscopy.

femoral stress syndrome and right knee pes bursitis. (*Id.*)

A second MRI of the brain conducted on October 9, 2006 showed no significant interval change in the appearance of the brain when compared to the previous MRI of July 14, 2006. (*Id.* at 188)

Dr. Shoemaker admininistered a series of Procrit injections September 18, 21 and 25, 2006, which resulted in significant overall improvement. (*Id.* at 274-78) After a fourth injection on September 28, plaintiff's psoriasis was flaring less. (*Id.*) As a result of the fifth injection on October 2, Dr. Shoemaker noted that plaintiff's psoriasis was no longer flaring. (*Id.*)

On October 31, 2006, plaintiff reported to Dr. Shoemaker that she had taken double dosage of medication the prior weekend. (*Id.* at 295) During that Tuesday office visit, she still experienced nausea, dizziness and numbness of her face. (*Id.*)

On January 31, 2007, plaintiff reported to Dr. Shoemaker that she was merely functional and that 10 minutes in the gym made her "ill." (*Id.* at 272)

During a pre-operative consultation for right knee arthroscopic surgery on January 23, 2007, Ramona Hunt, M.D. noted continuing right knee pain, severe mold allergies, neurological complications secondary to her allergies, moderate psoriatic arthritis and an area of red patches with white plaques on plaintiff's skin. (*Id.* at 249-50)

On February 27, 2007, plaintiff saw Lynda Crawford, M.D., complaining of bumps on her chin and right cheek. (*Id.* at 358) Plaintiff reported that her scalp psoriasis had cleared. (*Id.*) Although her health had improved after moving from the condominium, she continued to experience numbness on the left side of her face and toxic

10

encephalopathy. (*Id*.) Dr. Crawford noted scaly psoriasis patches on plaintiff's legs, arms and back. (*Id*.)

Plaintiff underwent arthroscopic surgery on her right knee on March 29, 2007. (*Id*. at 239-40)

On July 10, 2007, plaintiff was treated by Lisa N. Hawes, M.D. for complaints of urinary tract infection symptoms (frequency, urgency, suprapubic pressure and burning). (*Id*. at 362) Dr. Hawes noted that plaintiff had a normal posture and gait and full range of motion in all joints. (*Id*.) Plaintiff was diagnosed with a urinary tract infection and a backache. A renal ultrasound and cultures were ordered. (*Id*. at 362-63)

On July 24, 2007, Linda McGee, M.D. prescribed Prevacid to plaintiff for gastroesophageal reflux. (*Id*. at 580)

On November 6, 2007, plaintiff underwent a second spirometry examination. (*Id*. at 388) Results were normal with a lung age of 32 years, one year more than plaintiff's chronologized age. (*Id*.) Dr Shoemaker indicated that the psoriasis was "much improved." (*Id*. at 369) Plaintiff advised that her occasional fatigue had improved and that she was able to ride a bike and drive a car. (*Id*.) She complained of bilateral cramping in her hands and facial numbness, shortness of breath, tearing, redness and blurring of her eyes, tingling in her left arm, and vertigo when exposed to mold. (*Id*.) Her memory and concentration were normal. (*Id*.)

In a letter to Scott Nevin, plaintiff's counsel, dated March 7, 2008, Dr. Shoemaker confirmed a "clearly defined association between exposure to the water-

damaged condominium . . . and [plaintiff's] health symptoms and laboratory abnormalities. She acquired atypical chronic systemic inflammatory illness following exposure and re-exposure to the indoor air environment of her condominium residence." (*Id.* at 536) He labeled the illness as "mold illness,"a "chronic inflammatory illness acquired following the exposure to the interior environment of a water-damaged building (WDB) with resident toxigenic organisms, including, but not limited to fungi, bacteria, actinomycetes, mycobacteria and inflammagens such as beta glucans, hemolysins, proteinases and volatile organic compounds." (*Id.*)

In that letter, Dr. Shoemaker further stated that plaintiff improved rapidly following treatment with an oral medication, cholestramine (CSM). (*Id.* at 538) Her current symptoms included fatigue, weakness, aching, unusual sharp, stabbing pains in her right ear, headaches, sensitivity to bright light, red eyes and tearing. (*Id.* at 553 ) She had abdominal pain, non-secretory diarrhea, and pain in her feet and hands, with diffuse morning stiffness that lasted 30 minutes. (*Id.*) She had dense cognitive effects, difficulty with handling abstract numbers, impaired memory, concentration and word finding and decreased assimilation of new knowledge. (*Id.*) Plaintiff experienced mood swings, changes in appetite, sweats, particularly night sweats, difficulty controlling body temperature, excessive thirst and frequent urination. (*Id.* at 553-54) He further reported that plaintiff had numbness and tingling in both hands, along the same nerve distribution, metallic taste and vertigo. (*Id.* at 554) Plaintiff's last physical exam was essentially unremarkable. (*Id.*) She had difficulties following simple instructions and had a fine resting tremor of outstretched hands, the left greater than the right. (*Id.*) She

12

had psoriatic plaques, with nail pitting, but without proliferative changes. (*Id.*) She also had pitting edema without cords. (*Id.*) Pulmonary function testing did not show restrictive lung disease and the electrocardiogram was unremarkable. (*Id.*) Dr. Shoemaker stated that based on plaintiff's genetics, she will become rapidly ill with re-exposure to other water-damaged buildings if the CSM or other similar prophylactic therapies are not continued. (*Id.* at 557)

During an office visit on May 13, 2008, Dr. Shoemaker noted that plaintiff was a chemically sensitive individual and developing peripheral neuropathy with ongoing facial numbness and polyuria. (*Id.* at 595) Plaintiff indicated that she stayed at home to avoid exposure. (*Id.*) On May 25, 2008, plaintiff presented with an insect bite on her right ankle that resulted in redness, soreness and swelling for nine days. (*Id.* at 596) Plaintiff reported no joint soreness and that she was riding a stationary bike five days a week. (*Id.*) On August 18, 2008, she experienced exacerbation of her mold sensitivities and had been bedridden for two days. At that time, plaintiff asked for a folic acid prescription and stated that B12 injections helped with her energy levels. (*Id.* at 597)

### D. Medical Opinions Regarding Residual Function Capacity

Plaintiff's primary care physician, Dr. Ritchie Shoemaker, completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) on November 7, 2007. (*Id.* at 407-09) Dr. Shoemaker reported that, during an eight-hour workday, the plaintiff could lift or carry twenty-five pounds, lift or carry a maximum of ten pounds

13

occasionally,[10] lift or carry a maximum of five pounds frequently,[11] and she had returned to full weight bearing status. (*Id.* at 407) Plaintiff could stand/walk a total of four hours, or thirty minutes without interruption; sit a total of four hours, or thirty minutes without interruption; and occasionally climb, balance, stoop, and crouch; but could never kneel or crawl. (*Id.* at 408) She was impaired in pushing/pulling in that repetitive use brought on fatigue. She was unsteady and at risk for falls, and she should not be exposed to dust, fumes, and water-damaged buildings. (*Id.* at 409)

Dr. M. H. Borek, a medical consultant with the Disability Determination Service, issued a case analysis on May 5, 2008. (*Id.* at 534) Dr. Borek stated that he did not have sufficient evidence to evaluate the severity of plaintiff's psoriatic arthritis or auto-immune conditions and, therefore, was unable to render a medical decision. (*Id.*) At that time, plaintiff had not seen her physicians for the past three months and she refused to attend the consultative examination with Dr. Borek. (*Id.*)

### E. Hearing Before ALJ

#### Plaintiff

Plaintiff testified that she is a college graduate and had worked in the past as a bank teller, cashier, and caller for customer service. (*Id.* at 34) She moved permanently out of her condominium in July 2006 and into her parents' home, where she continues to reside. (*Id.* at 35)

---

[10] Occasionally being defined as "from very little up to 1/3 of an eight-hour day." (D.I. 12 at 407)

[11] Frequently being defined as "from 1/3 to 2/3 of an eight-hour day." (D.I. 12 at 407)

Plaintiff testified that a visible red rash on her arms, covering at least 45% of her skin, appeared within the past two weeks and the treatment for it with steroid creams could exacerbate her "mold issue." (*Id.* at 28) She stated that, although her arms would crack and bleed regularly, she was not limited in walking, standing, or lifting, but was afraid of infections. (*Id.* at 29) She avoids going outside because, if exposed to "something," the left side of her face becomes numb and she experiences nausea and dizziness. (*Id.* at 30, 36)

Plaintiff stated that she takes the following medications: CSM twice daily to remove toxins from her body; Welchol and Trental to increase capillary blood flow; and Aciphex for reflux and stomach problems due to the other medications. (*Id.* at 36) She admitted that the medications help, but their peak effectiveness varies one to five days. (*Id.*) She also testified that the long term treatment for her conditions improved her health, but symptoms increase after re-exposure. (*Id.* at 37)

Plaintiff testified that the right knee surgery in 2007 resolved her knee problems, but she developed some neuropathy in her legs. (*Id.* at 38) She has pain in her wrists and a rash on her arms, but otherwise has no trouble lifting between ten to fifteen pounds. (*Id.*) She further stated that she can stand for up to an hour and sit for a couple of hours before her legs begin to swell. (*Id.* at 38-9) At the time of the hearing, plaintiff had difficulty walking long distances due to problems with her left ankle and an injury to her Achilles tendon. (*Id.* at 39)

Plaintiff testified that she spends her days taking online college classes with DeVry University and doing schoolwork. (*Id.*) She rides a stationary bike to keep her

legs mobile, and had been walking three times a week prior to the recent Achilles tendon injury. (*Id.* at 39-40)

### Vocational Expert

During her testimony, the ALJ asked the VE if plaintiff's past jobs entailed significant exposure to mold. (*Id.* at 41-2) The VE responded that it depended on the particular buildings and their locations rather than the specific job. (*Id.* at 42) She stated that the potential for mold to exist or be absent could occur at any job site. (*Id.* at 43) The VE noted that the work environment, rather than the type of work, was the limitation for plaintiff. (*Id.* at 45-6)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ are conclusive if they are supported by substantial evidence. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). The United States Supreme Court noted that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). This same standard, according to the Supreme Court, is applied for deciding summary judgment under FEDERAL RULE OF CIVIL PROCEDURE 56. The threshold inquiry, under Rule 56, is whether there is a need for a trial - whether, in other

16

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"[T]his standard mirrors the standard for a directed verdict under FEDERAL RULE OF CIVIL PROCEDURE 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). In the context of judicial review under 42 U.S.C. § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion. *See Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Therefore, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour*, 806 F.2d at 1190. This is a deferential standard in which the court may not undertake a *de novo* review of the ALJ's decision and may not re-weigh the evidence. *See id.* Accordingly, even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See id.* at 1191.

If the claimant submits evidence to the district court that was not provided to the ALJ, the district court may remand to the Commissioner. Sentence six of § 405(g) governs whether remand is appropriate. *See Matthews v. Apfel*, 239 F.3d 589, 592 (3d

17

Cir. 2001). Thus, any evidence first presented to the district court must be new and

material, and also supported by the claimant showing "good cause for not having

incorporated the new evidence into the administrative record." *See id.* (quoting *Szubak*

*v. Sec'y of HHS*, 745 F.2d 831, 833 (3d Cir. 1984)).

> No statutory provision authorizes the district court to make a decision on the
> substantial evidence standard based on the new and material evidence never
> presented to the ALJ. Instead, the Act gives the district court authority to remand
> the case to the Commissioner, but only if the claimant has shown good cause
> why such new and material evidence was not presented to the ALJ. *See*
> *Matthews*, 239 F.3d at 594.

## IV. DISCUSSION

### A. Regulatory Framework

The Social Security Administration regulations establish a five-step sequential

evaluation process for determining whether a claimant is disabled. 20 C.F.R. §

404.1520(a). If at any of the steps it is determined that claimant is not disabled, the

evaluation does not continue.

First, the ALJ must determine if the claimant is currently engaged in substantial

gainful activity (SGA). 20 C.F.R. § 404.1520(b). If the claimant is engaging in SGA,

then she is not disabled. But if the claimant is not engaging in SGA, then the ALJ

considers the second step, whether the claimant has a "severe" impairment or

combination of impairments that are "severe," that is, significantly limit(s) the individual's

ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the claimant has a

severe impairment or combination of impairments, the third step is to determine if,

based on the medical evidence, the impairment meets the criteria listed in 20 C.F.R. pt.

404, subpt. P, app. 1 (1991), which results in a presumption of disability, or whether the

18

claimant is still able to work. If the impairment or combination of impairments do not meet the criteria for a listed impairment, then the ALJ proceeds to the fourth step and assesses whether despite the impairment(s), the claimant has the residual functional capacity to perform her past work. 20 C.F.R. § 404.1520(e). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)). If claimant cannot perform her past work, then the ALJ proceeds to step five, to determine whether the claimant can perform any other work considering her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is not able to do other work, she is disabled. It is within the ALJ's sole discretion to determine whether an individual is disabled or unable to work under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ must consider all the medical findings and other evidence which support a physician's statement of disability. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of the impairments. The ALJ, however, will not give special significance to the source of an opinion on issues which are reserved for the ALJ, such as the ultimate determination of disability. 20 C.F.R. §§ 404.1527(e)(2)-(3). The ALJ has the discretion to weigh any conflicting evidence in the record and make a final determination. 20 C.F.R. § 404.1527(c)(2).

### B. The ALJ's Decision

The ALJ, after considering the medical evidence of record and testimony during

19

the hearing, concluded that plaintiff is not disabled under the Social Security Act,

sections 216(i) and 223(d), and is able to perform past relevant work. The ALJ made

the following enumerated findings.

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since September 16, 2006, the alleged onset date (20 C.F.R. § 404.1571, et seq.).
>
> 3. The claimant has the following severe impairments: psoriatic arthritis, fibromyalgia, psoriasis, HLA-B-27 associated spondyloarthropathy, toxic encephalopathy, right knee patella femoral stress syndrome, right knee pes bursitis, immune response gene segregation disequilibrium confirmed by presence of the "mold susceptible" haplotype 11-3-52B, and chronic fatigue syndrome (20 C.F.R. § 404.1521, et seq.).

Additionally, the ALJ determined that plaintiff's gastroesophageal reflux disease

was not severe because the medical record as a whole indicated that it has only "a

minimal effect on her ability to perform basic work activities." (D.I. 12 at 16-7).

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).

The ALJ reviewed sections 1.00 et seq. and 14.00 et seq. of 20 C.F.R. part 404,

Appendix 1 related to musculoskeletal system disorders and immune system disorders

respectively. (Id. at 17) He concluded that the precise criteria of the listings had not

been met. (Id.) Additionally, he found that "no physician . . . mentioned any findings

equivalent in severity to any listed impairment, nor are such findings indicated or

suggested by the evidence of record." (Id.)

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: with decreased

20

exposure to molds.

In this regard, the ALJ considered all symptoms and the extent to which they were reasonably consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. (*Id.*) This involved a two-step process in which the ALJ first considered whether there was an underlying "medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and he "evaluate[d] the intensity, persistence, and limiting effects of claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." (*Id.*) The ALJ then considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (*Id.*)

Although the ALJ concluded that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," he found that the medical record as a whole (and plaintiff's own statements) did not support the alleged severity of the symptoms and that plaintiff did not establish that she could not perform substantial gainful activity as a result of her severe impairments. (*Id.* at 18-22)

> 6. The claimant is capable of performing past relevant work as a bank teller. This work does not require the performance of work-related activities precluded by claimant's residual functional capacity (20 C.F.R. § 404.1565).

The ALJ noted that the "claimant previously performed the job of teller/assistant manager (DOT code 186.167-070), which the vocational expert testified was light and skilled."[12] (*Id.* at 22) In comparing her residual functional capacity with the physical

_____

[12] Residual functional capacity and past relevant work are classified as either sedentary, light, medium, heavy or very heavy. *Burnett v. Comm'r of SSA*, 220 F.3d

demands of the work, the ALJ found that plaintiff was able perform such employment and the job description "involves no exposure to any environmental limitation aside from noise." (*Id.*)

> 7. The claimant has not been under a disability, as defined in the Social Security Act, from September 16, 2006 through the date of this decision (20 C.F.R. § 404.1520(f)).

## C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because it: (1) improperly substituted the ALJ's judgment for that of the medical expert; (2) did not give appropriate deference to the treating physician's opinion; (3) was not supported by the vocational evidence; and (4) the residual functional capacity findings were contradicted by the severity findings. (D.I. 15) The court will consider each of the plaintiff's arguments in turn.

### 1. Substitution of ALJ's judgment for the medical expert

Plaintiff contends that the ALJ improperly substituted his own judgment for that of the only medical opinion in the record, her treating physician, Dr. Shoemaker. She further states that, due to the absence of a medical determination by the state agency physician, Dr. Borek, the ALJ's only options were either to accept the treating physician's opinion or obtain a medical opinion from another physician with expertise concerning the relevant impairments. (*Id.* at 6-8) In making a disability determination, the ALJ "may reject the opinion of a treating physician if the opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent

---

112, 120 (3d Cir. 2000)(citing *Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994)); 20 C.F.R. § 404.1567.

with other substantial evidence in the record." *Sanchez v. Barnhart*, 388 F. Supp. 2d 405, 411 (D. Del. 2005) (citing *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001)). The ALJ must adequately explain any reasons for rejecting a treating physician's opinion and, when doing so, must consider factors such as "length of the treatment relationship, nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, and specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion." *Id.* at 411-12 (citing 20 C.F.R. § 404.1527(d)(2)-(6)). The Third Circuit has explained that, although an ALJ is not permitted to reject an examining physician's conclusions on credibility alone, he "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Morales v. Apfel*, 22 F.3d 310, 318 (3d Cir. 2000); *Plummer*, 186 F.3d at 429.

In the present matter, the ALJ extensively reviewed plaintiff's medical history and symptoms and determined that she has several severe impairments. (D.I. 12 at 12) Nonetheless, the ALJ found that the combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, and that plaintiff could still perform a full range of work at all exertional levels with the nonexertional limitation of decreased exposure to molds. (*Id.* at 17) The ALJ's decision listed specific instances where either Dr. Shoemaker's records and notes or plaintiff's own testimony support his determination. (*Id.*) The ALJ did not reject Dr. Shoemaker's opinion. Instead, he accorded more weight to Dr. Shoemaker's conclusions that were

supported by the medical evidence and less weight to those that were contradicted or unsupported by the objective medical record. (Id. at 17-22) The ALJ provided detailed, supporting explanations and references to the medical record in each instance that Dr. Shoemaker's opinions were given less weight. (Id.)

When there is substantial evidence supporting the ALJ's finding of fact, they are considered conclusive. See Monsour, 806 F.2d at 1190. The ALJ noted that the medical record does not support the functional limitations that plaintiff claimed at the hearing, as Dr. Shoemaker's opinion of functional limitations are significantly less. (D.I. 12 at 18-9, 407-8) Throughout 2007 and 2008 plaintiff reported, and the medical notes concur, that she was generally improving. (Id. at 358, 369, 538) Also, in July 2007, Dr. Hawes observed after the arthroscopic surgery that plaintiff's posture and gait were normal, with a full range of motion in all joints. (Id. at 362-63) Since the ALJ's determination is supported by the record, the court cannot conclude that the ALJ impermissibly substituted his opinion for that of plaintiff's treating physician. Gooden v. Barnhart, No. 01-570-JJF, 2002 U.S. Dist. LEXIS 27035, at *26 (D. Del. Jul. 18, 2002) (citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991)).

Plaintiff's argument that the lack of a medical determination by the state agency physician is fatal to the ALJ's decision is misplaced. Plaintiff's reliance on Sims v. Apfel, 530 U.S. 103, 111 (2000) in support of that proposition is in error. The Sims Court imposes no such requirement, and specifically explained that the ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits." Sims, 530 U.S. at 111. In so finding, the Court referenced its earlier opinion

24

in *Richardson v. Perales*, 402 U.S. 389, 400 (1971), which noted "that (a) Congress granted the Secretary the power by regulation to establish hearing procedures; (b) strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent; and (c) the conduct of the hearing rests generally in the examiner's discretion."

Either accepting the treating physician's opinion or obtaining another medical opinion are not the only options. Nor is it required that the state agency physician provide an opinion before the ALJ can render a decision: a decision may be based solely on testimony and medical evidence. *Lepencia v. Comm'r*, 107 Fed. Appx. 291, 294 n.1. (3d Cir. 2004) (because sufficient evidence existed in the record to support the ALJ's denial of benefits, the court need not address whether plaintiff's refusal to undergo an examination constituted independent grounds for the denial). Plaintiff refused to attend a consultation with the state agency physician as she believed it to be "a waste of time," and thereby denied the ALJ the benefit of that medical evaluation. (D.I. 12 at 155) The absence, however, of that assessment does not mandate the ALJ to accept the treating physician's opinion, if it is unsupported by the medical evidence. *Lepencia*, 107 Fed. Appx. at 294 n.1.

### 2. Deference to treating physician's opinion

Plaintiff maintains that Dr. Shoemaker's opinion should have been given controlling weight or, in the alternative, substantial deference. (D.I. 15 at 8-9) Plaintiff cites to 20 C.F.R. § 404.1527(d)(2) for the factors an ALJ considers to decide the weight assigned to a treating physician's opinion if it is not afforded controlling weight.

25

(*Id.* at 9) Although a treating physician's opinion is entitled to "great weight," a doctor's opinion on disability is not dispositive. Further, the ALJ may discount a treating physician's opinions if they are not supported by the medical evidence. *Bates v. Astrue*, No. 07-074-JJF, 2008 U.S. Dist. LEXIS 30817, at *34 (D. Del. Apr. 11, 2008) (citing *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001) & *Mason v. Shalala*, 944 F.2d 1058, 1067 (3d Cir. 1993)).

The ALJ extensively analyzed the treating physician's findings and conclusions. (D.I. 12 at 17-23) After thoroughly reviewing the medical evidence, the ALJ found that many of Dr. Shoemaker's conclusions were "internally inconsistent" as they "reveal[ed] that the [plaintiff] may be released to work on several occasions and then indicate that the [plaintiff] is permanently disabled." (*Id.* at 21) He further determined that Dr. Shoemaker's opinion dated November 7, 2007 was "consistent with the medical record as a whole," but was also "in conflict with [his] remaining opinions." (*Id.*) Therefore, the ALJ concluded that Dr. Shoemaker's findings that were consistent with the medical record merited "some weight," whereas his other conclusions not supported by the medical record were accorded only "little weight." (*Id.* at 22) The ALJ applied "little weight" to Dr. Borek's comments, who was unable to render an opinion. (*Id.* at 21)

The court finds that the ALJ properly weighed Dr. Shoemaker's findings in relation to the medical evidence, and provided sufficient reasons for his determination. The ALJ noted the inconsistencies between Dr. Shoemaker's opinions and his notes, but was deferential to those findings supported by the medical record. (*Id.* at 21-2) The ALJ further observed that plaintiff's testimony of being restricted from "mold carrying

visitors" was self-imposed; Dr. Shoemaker never prescribed that restriction and only limited her exposure to dust, fumes or water damage. (*Id.* at 23) Further, the ALJ correctly stated that "regardless of Dr. Shoemaker's opinions about the [plaintiff's] disabled status, opinions regarding a claimant's ability to work are administrative findings and as such are reserved to the Commissioner." (*Id.* at 21)

Although a "treating [physician's] opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance," a doctor's opinion "about issues reserved to the Commissioner must never be ignored." SSR 96-5P. Any "decision must explain the consideration given" to the treating physician's analysis. *Id.* Here, the ALJ properly weighed Dr. Shoemaker's opinion and provided the bases for his determination as required under 20 C.F.R. § 404.1527. (D.I. 12 at 21-2)

### 3. Residual functional capacity findings

Plaintiff contends that the ALJ's finding that she has severe impairments necessarily contradicts his decision of not disabled and a residual function capacity of full range of work at all exertional levels. (D.I. 15 at 10).

Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). A severe impairment under subsection (a) is one that limits the ability to perform basic work activities. In determining functional residual capacity, the ALJ must determine the maximum work activities a plaintiff can do despite any limitations. 20 C.F.R. § 404.1545(a)(1).

In the instant matter, the ALJ considered plaintiff's testimony regarding her

exertional limitations, her restrictions according to Dr. Shoemaker and Dr. Hawes' report regarding her posture, gait and range of motion. (D.I. 12 at 17-22) The ALJ found plaintiff's non-exertional limitation to be decreased exposure to mold and that "[plaintiff's] functional capacity allows her to perform light work." (Id. at 17, 22) In reaching this conclusion, the ALJ relied on Dr. Shoemaker's opinion that the plaintiff could lift a maximum of twenty-five pounds, ten pounds occasionally, and five pounds frequently, and that "[plaintiff's] ability to sit, stand, or walk equaled sufficient time for her to work for 8 hours in a day." (Id. at 21-2) Dr. Hawes observed that plaintiff had "normal posture and gait with full range of motion in all joints." (Id. at 20, 362-63) Plaintiff reported in 2008 that she had no difficulties with personal care, running errands, going to doctor appointments, leaving her home once a day, going out to dinner with friends, or walking a mile. (Id. at 17-8) The ALJ noted that, according to the record, plaintiff functioned at a much higher level than she testified and she self-limited her abilities. (Id. at 19) At the hearing, plaintiff testified that she exercised three times a week by walking or riding a stationary bike, and she took online college classes. (Id. at 39-40) Thus, considering plaintiff's testimony and Drs. Shoemaker and Hawes's reports of her functional abilities, the ALJ concluded that plaintiff has the functional capacity to do light work with decreased exposure to molds.

A finding of severe impairment alone does not mean that a plaintiff is disabled. 20 C.F.R. § 404.1520. The impairment must match an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 for a finding of disability. If it does not, then the ALJ determines a plaintiff's residual functional capacity as provided under 20 C.F.R. §

404.1520(e), and determines whether the plaintiff has the residual functional capacity to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(f), 404.1525, 404.1526.

In the present matter, the ALJ's finding that plaintiff has severe impairments does not establish disability. Since her impairments do not match one listed in 20 C.F.R. pt. 404, subpt. P, app. 1, the ALJ determined her residual functional capacity based on the medical evidence and testimony, and found plaintiff able to perform a full range of work at all exertional levels, specifically at her past relevant work level, with decreased exposure to mold. The ALJ followed the analysis required under 20 C.F.R § 404.1520 for determining disability; therefore, his findings are not contradictory.

### 4. **Vocational evidence**

Plaintiff contends that the ALJ did not consider the VE's testimony in concluding that she could perform her past relevant work; that the exertional and non-exertional requirements of her past relevant work were not described in the reports or the hearing testimony; and that the ALJ's designation of DOT code 186.167.070 for assistant manager of a financial institution, rather than DOT code 211.362.018 for teller at a financial institution, is reversible error. (D.I. 15 at 11-4)

Plaintiff's first two contentions are without merit. During the hearing, the VE testified about plaintiff's past relevant work for each relevant job position beginning in 1993 and indicated the level of skill and the exertional level required. (D.I. 12 at 41-2) The VE described plaintiff's prior work as a teller as "skilled and light." (*Id.* at 42) The ALJ asked the VE to evaluate if someone with plaintiff's limitation of decreased

exposure to mold could perform any of her past relevant work. (*Id.*) The VE advised that it was the work environment, rather than the specific job, which affected plaintiff and she could perform administrative tasks, but not in a building with a mold problem. (*Id.* at 42-6) The ALJ correctly applied the VE's analysis, noting that, for his determination, emphasis is on the job and not the work environment "to the exclusion of the job." (*Id.* at 23) Thus, the ALJ considered the VE's testimony to the extent it was relevant to his decision.

Remand is not required if the outcome of the case would be the same. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (citing *Fisher v. Bowen*, 869 F.2d 1055 (7th Cir. 1989) (administrative law does not require the court to remand a case "in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")). The court's role "is not to impose its own interpretation . . . but to instead defer to [the agency's] position so long as it is reasonable." *Monsour Med. Ctr.*, 806 F.2d at 1191 (citing *Butler County Mem'l Hosp. v. Heckler*, 780 F.2d 352, 355 (3d Cir. 1985)).

Here, the ALJ concluded that "[plaintiff] previously performed the job of teller/assistant manager (DOT code 186.167-070), which the vocational expert testified was light and skilled." (D.I. 12 at 22) Although plaintiff was not an assistant manager, she previously worked as a bank teller. The ALJ's error is not material as the two positions are classified as light work. Dep't of Labor, DICTIONARY OF TITLES (DOT) Codes N. 186.167-070 & 211.362.018. Therefore, in determining plaintiff's ability to perform her past relevant work with respect to her residual functional capacity, this

discrepancy does not require remand as the result would be the same.

The court notes that attached to plaintiff's brief is a letter dated November 9, 2009, from Dr. Shoemaker to Monique Lee, Esq.,[13] disputing the ALJ's determination that plaintiff is not disabled. (D.I. 15) In that four page letter, Dr. Shoemaker elaborates on his diagnosis of plaintiff's mold-related illness and opines on what he considers as the proper analysis for a determination of disability. (*Id.*) Whether a plaintiff is disabled for the purpose of disability benefits is solely reserved for the ALJ, not a treating physician. *See* 20 C.F.R. § 416.927(e)(1). The "ultimate determination of disability rests with the [ALJ], and not with the treating doctor." *LaFleur v. Comm'r of SSA*, 107 F.3d 871 (Table), 1997 WL 73261, *1 (6th Cir. Feb. 19, 1997)(citing *Houston v. Sec'y of Health and Human Serv.*, 736 F.2d 365, 367 (6th Cir. 1984)).

Additionally, the Third Circuit has recognized that "evidence first presented to the district court must not only be new and material but also be supported by a demonstration by claimant of good cause for not having incorporated the new evidence into the administrative record." *Matthews*, 239 F.3d at 592 (citing *Szubak v. Sec'y of HHS*, 745 F.2d 831, 833 (3d Cir. 1984)). "Evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." *Id.* at 594. A plaintiff bears the burden of showing good cause. *Id.* at 595. In the instant matter, plaintiff failed to provide any basis for not originally presenting Dr. Shoemaker's further explanation on her mold-related illness to the ALJ. As a result, she has not met her burden of showing good cause.

---

[13] Monique L. Lee is an attorney with Jenkins Block and Associates in Cambridge, Maryland. She was plaintiff's prior attorney in this matter.

31

**V. Conclusion**

In light of the foregoing, substantial evidence supports the ALJ's determination that plaintiff is not disabled and is capable of performing light past relevant work as a teller in a financial institution. Plaintiff's motion for summary judgment (D.I. 14), therefore, is denied and defendant's motion for summary judgment (D.I. 16) is granted. An appropriate order shall issue.